Dvorak v. Clean Water Services Good morning, Craig Crispin. On behalf of Plaintiff Appellant Doug Dvorak, may it please the Court. This overriding question in this case is whether the District Court can take the inferences urged by the defendant, a non-moving party in a summary judgment proceeding, and decide the case on those inferences and reject the equally plausible inferences that are offered by the non-moving party, in this case the plaintiff. The question specifically deals with whether plaintiff's evidence of disability raises factual questions that must be resolved by the jury rather than the District Court in the first place. Although the defendant here moved on a number of grounds, the District Court expressly did not reach anything other than the question of disability. The District Court concluded that plaintiff failed to come forward with evidence of an actual disability, regarded as disability, or a record of disability when the facts in the case clearly provide inferences that those in fact existed. In reaching its conclusion, the District Court rejected quite a voluminous record of medical evidence showing actual disability. It disregarded compelling evidence that defendant regarded plaintiff as disabled in a broad range of occupations and a class as well, and finally ignored the record of disability compiled by defendant in its own initial examination of plaintiff and also in its manipulation of the medical evidence toward the end when it was shopping for doctors that initially would not give the right answer and they kept asking pointed and suggestive questions until they finally got one that they could rely on. All of that, from the beginning of initial employment examination showing the disabilities and impairments through its own actions as the employer's attorney trying to get the right answer,  and here all we're dealing with is inferences that a record existed as well that they acted upon. Can you just help me with one thing? I'm just curious. I've never seen a case in which it was claimed that there was both an actual disability and a perceived disability, and I just wondered if you could explain to me a little bit how that works here. Sure. There is a, I've seen in the cases, this tension between can one have an actual disability and also regard it as? And I don't think that there's a real inconsistency in that question. We believe that there's an actual disability and plenty of evidence in this record that a fact finder could conclude that Mr. Dvorak had an actual disability. Well, what that was, was that an addiction? Well, that was one of them, although that's more focused on the regarded as record of. Right. It's the walking. He had a service-related disability and then later three surgeries to reconstruct his knee. He wore a knee brace. Now, that did not eliminate all his issues with that, so under Sutton it doesn't take that away. He testified, or in his declaration, had two different paragraphs, and you'll notice what the district court did was conflated those two. In one paragraph he talks about what the brace allows him to do. The next paragraph, paragraph eight of his declaration, he talks about his limitations of being unsteady, of being unable to squat, to bend a knee. He also has neck and shoulder problems and identified a major life activity of lifting, and he had testimony in the record that anything above his shoulder height, although he may be able to do it, as well as anything down on the ground. So they had evidence, for example, that he lifted, I think it was manhole covers. And what he testified to was, yes, he could do that as part of his job, but sometimes and often, in fact, if he did particularly lift above his shoulders, that would be so painful that he would have to go to bed. That's all he could do. He could, in fact, take care of his daughter, but when he did that, he would be so severely in pain that he could not continue to function, and the only thing he could do would be to go to bed and rest up. So what are the disputed questions of fact? I'm sorry, Your Honor. What are the disputed questions of fact? Well, the disputed questions of fact are whether or not these impairments established a substantial limitation on a major life activity. The district court looked at these and engaged in a method of eliminating for various reasons different pieces of plaintiff's testimony. For example, he said that all of the testimony that Mr. Dvorak offered about his in other words, present tense, and so semantically, you know, we all write in present tense because we think it's more effective, and so he's testifying in present tense. The district court said, well, that testimony is disregarded because it does not address how he was at the time. Well, the point is that it's at least relevant to what he was at the time, how he was affected at the time. Similarly, the district court rejected evidence from the VA and his other medical records, a rehabilitation person, in that it also was addressed to a present situation. Now, to the district court's credit, there was testimony that he had worsened during that time. Well, that's a factual question. Now, did he worsen the what? That he worsened since he was working on the workplace, and the district court said, well, the present information sometime later must be disregarded because both it's not addressing how he was at the time, and there was this period of worsening. Well, that's – it may call into question, but it certainly doesn't take it and make it totally irrelevant to what his physical limitations and impairments were and the effect, potential effect, on major life activities at the time. And so the – The job he had was he was cleaning out the sewers and the storm drains. He was cleaning out the sewers and storm drains. Well, he was working on a variety of tasks. Right. The agency took care of the wastewater and the water system here in Washington County, and he was out there on a crew. He did a variety of things on that. Now, he did ask for reasonable accommodation once the employer kept coming back and using these doctors that they shopped for and opinions that they almost wrote asked for accommodation, which they – which the employer had granted for a long time. They said, okay, you know, the effects of these medications. The supervisor said, well, when you feel it, you just have your partner drive instead of driving at the time. So they'd accommodated that for a long time until they shopped around and got this opinion that he had a – I think – I'm not sure what the phrase was, but a dependency on medication. He was an addict. Essentially. Right. Exactly. So that's the issue. He didn't use the term. That's not the only issue, but that is an issue on the regarded-as side. Now, if he – Well, it was – he was a named employee of the year at one time, wasn't he? Exactly the year before they decided to terminate him. And during that time, there's evidence in here, which defended disputes, evidence that the supervisors were aware that he was using medication, these narcotic pain killers, which permitted him to do his job, and that others, in fact, were using the same kind of medication on occasion, yet were accommodated, as they did with Mr. Dvorak, until they got these doctors to say that he was dependent. Yeah. Can you fire somebody who's – is addiction a disability, protected disability? The cases say – most often it's regarded-as, but there's a number of cases, and I can't – I don't think I cited them, in which an addiction must be reasonably accommodated. It is a disability. You know, typically I look at these cases as how – what's the substantial limitation on major life activity? And the impairment is the addiction. Is there a substantial limitation? It affects interaction. It affects ability to think. So I think in most cases, addiction would be. I do want to reserve some time. I've used up – Perfect. You have. Thank you. Senator Tula. May it please the Court. David Wilson on behalf of defendants. With respect to the walking, the claim of a walking disability, Mr. Dvorak had a heavy construction job. At the time that his employment ended, he testified he was able to do that job. He could do all of the walking involved in that job. He never went to his treating physician, the Veterans Administration, about any walking limitation. My client, Clean Water, never received any statement from any doctor that he had any limitation on his walking. Well, he had a knee brace, didn't he? Correct. He had a knee brace. The plaintiff relies on evidence that his walking was limited 11 months after he was terminated and other evidence that his walking was limited two years after he was terminated. And he also admits that his condition substantially changed during that interval. He was able to do all the functions of his job in August of 2003. In 2004, he testified, I was unable to do my job even with medications. So his condition had substantially changed over that time. The district court properly concluded that evidence of his condition when he was unable to work a year or two years later doesn't tell us whether he had a disability back when he could work. So the district court certainly was correct on that point. So you say that there's no disputed issue of fact, no material issue of fact in dispute here, really, as to his ability to work when he was working? Correct. As of the point in time when the discrimination allegedly occurred, and that's the point in time that we're looking at. With respect to lifting, again, there was no statement or medical statement of any kind to Clean Water while Mr. Dvorak was working that said he had any limitation on lifting. His job required extensive lifting, including 90-pound, I think they were manhole covers or grates, that he and another worker would lift together. He did all that work and testified. He could do all the lifting involved in his job. No doctor limited his lifting while he was working. Again, plaintiff relies on evidence of what he could do after he was unable to work, at a different time after his condition changed. Regarding perceived disability, we hear an awful lot about the defendant was out shopping for doctors and looking for the doctor to say the right thing so they could finally get rid of this man. Well, let's go back and take a look at why was he ever going to a doctor? The reason he was going to a doctor was that he came to Clean Water and said, I want to work using medical marijuana instead of the pain medications. Is that okay? Clean Water said, if it's medically approved, that's fine. That's why he went to a doctor in pursuit of his own request. Clean Water first went to the doctor who prescribed marijuana until it found out that he had lost his license. Then it went to Dr. Anderson, who said, Mr. DeVore cannot work with marijuana. Clean Water said, we're not necessarily going to stick with that opinion. Do you want to go to another doctor and be examined? And Mr. DeVore said, yes. So he went to Dr. Antoniscus. He didn't go to Dr. Antoniscus because we were shopping for somebody to say he couldn't work. It's admitted, our concise statement says, and plaintiff admits, that the sole reason he went to Dr. Antoniscus was to find out if he could work with medical marijuana. The sole reason, that's admitted. So we weren't shopping for doctors to find something against him. We were trying to help him see if he could achieve what he wanted to do. Dr. Antoniscus responded with a letter on December 5 of 2005. That letter was a turning point in this chain of events. Prior to that letter, Clean Water had no suspicion that he was a danger to anybody or that his medications were a danger. Dr. Antoniscus, without our request, made a number of statements that raised that issue. And that was something we could not ignore. So instead of shopping around for somebody to say the right thing, we went, tried to go, to the doctor who prescribed these medications. The doctor at the Veterans Administration. We assumed this doctor would say, okay, yes, he can work safely. The response was not from the doctor. The response was from the VA's regional council, saying, we're not going to get involved in this. And that was a danger signal to Clean Water Services. The lawyer for Veterans Administration would not let the doctor even say, answer our questions about whether this man could work safely. That was a danger signal. It's at that point that we took him off the job with pay. No. No. How do you know that this was the form letter? Because the letter was specific about these circumstances. So maybe they sent the letter out to everyone because they got so much to do and they get all these inquiries. He could have gotten them. Did you ask him to get his VA medical records? Well, we did ask for the records from the Veterans Administration after there was this refusal, which I don't have the text of it committed to memory, but the implication, I mean, it was not an implication. It was direct, that they were not going to allow their doctor to tell us if this man could work safely. I mean, these are standard questions that doctors answer routinely. So the prescribing doctor will not say, we can't get from the prescribing doctor any confirmation that the man can work safely. We went back to the plaintiff and asked him, are you willing to go back to Dr. Antoniscus again? He said he was. This time Dr. Antoniscus had the VA records. He didn't have them the first time. And the VA records are replete with statements from the treating doctors that they are very concerned about these medications. And I've set them out in my brief, but... Let me ask you this, because I really am a little perplexed here. He worked for a long time, and then he gets fired, or he's no longer working, and what was the... Is it your position that his condition changed, or that he couldn't work when he was working, or what? His medication increased substantially in 2002. So the dosage went substantially up. That's set out in Dr. Burton's letter. And Dr. Burton is quite clear that this man is under the influence, and the plaintiff himself admitted that. Okay. So it's the increased dosage over the years. Are there any further questions? Judge Schroeder, I want to get back to a question you asked earlier that I don't think I fully answered on regarded as versus actual. In this particular case, we've got actual relying on the knee and neck impairments, and the regarded as relying on the thought of addiction. I want to clear that up. The talk about whether he could do the job and later couldn't, the medical report talks about him being unable to work because of the failure to accommodate by the employer, so I don't think that goes very far. The regarded as, they went through a number of doctors and a number of efforts to get the right opinion here in the face of Dr. Thomas, the plaintiff's own doctor saying he was not an addict, yet they forced him to go on pain of termination to this rehabilitation program that he didn't need. What relief are you seeking? Relief? He's not going to be able to go back, but he did lose his ability to continue working with accommodation, so we're seeking the range of damages that would be available for that, his lost economics up to the point where he became unable to work. You're talking so fast, I'm missing words. My red light's on, that's why I'm talking so fast. I won't give you a ticket. We'd be seeking economic losses from the point that he was prevented from working up until the point where he became unable to work, and we'd be seeking the full range of damages, the general damages associated with the discriminatory termination, and if the facts warranted it, the punitive damages. Okay, how much longer do you think he could have worked, this all kind of? With accommodation, had they continued the accommodation, he could have worked at least a couple years. Okay, thank you. Thank you.
judges: Schroeder, Pregerson, Strom